[Crim. No. 33229. Second Dist., Div. Four. May 2, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL STEVEN CORNEJO et al., Defendants and Appellants.

638

COUNSEL

Thomas Kallay and Patrick M. Thompson, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ALARCON, J.—Appellants have appealed from their judgments of conviction following a trial by jury. Their appeal is consolidated; however, they were represented by separate counsel at trial and on appeal, and some distinct issues are raised by each.

Appellant Ramirez was convicted of violation of Health and Safety Code section 11352, sale of heroin, and the jury made a special finding that he sold less than one-half ounce of heroin. Appellant Ramirez was found not guilty of count II, violation of Health and Safety Code section 11352, sale of cocaine, and count III, violation of sections 496 and 664 of the Penal Code, attempted receipt of stolen property.

Appellant Cornejo was found guilty of count I, violation of Health and Safety Code section 11352, sale of heroin, and the jury found that defendant Cornejo sold more than one-half ounce of heroin. Defendant Cornejo was found guilty of count II, violation of Health and Safety Code section 11352, sale of cocaine, and guilty of count III, violation of Penal Code sections 496 and 664, attempted receipt of stolen property.

Prior to trial, defendants moved under Penal Code section 1538.5 to suppress all evidence seized within defendant Cornejo's apartment on the grounds that the entry into the apartment and the seizure were unlawful. The motion to suppress evidence was denied. Thereafter defendant Cornejo moved for a severance of his trial from that of defendant Ramirez. The motion for severance was also denied.

*Contentions on Appeal.*

A. *Cornejo*

1. The warrantless arrest of defendant Cornejo in his home was unlawful, in violation of *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333].

2. The entry of the arresting officers into defendant's home was effected in violation of Penal Code section 844.

3. The court erred in denying defendant Cornejo's motion for severance of the trials.

4. The trial court erroneously ruled that an informant could exercise his Fifth Amendment privilege not to testify.

5. The trial court erroneously deprived appellant of his right to testify on his own behalf during the motion to suppress evidence.

B. *Ramirez*

1. The trial court erred in allowing the informant to exercise his Fifth Amendment privilege and refuse to testify for defendants.

2. The trial court erroneously accepted a jury verdict which was contrary to the evidence presented.

3. The court erred in denying defendant Cornejo's motion for severance.

*Summary of the Facts*

The following evidence was presented at the hearing on the motion to suppress evidence:

Officer Bruce Biggins testified that he is an investigator assigned to the South Gate Police Department, burglary assault team. Some time before July 14, 1977, Officer Biggins worked with an informant by the name of Ernest Leonard Kelly. Kelly told Biggins that an individual by the name of Bobby Ramirez was dealing in heroin and that Kelly would introduce Biggins to Ramirez so that Biggins could try to arrange an exchange of

guns for heroin. The officer asked the informant to set up a meeting between him and Ramirez, which meeting occurred on July 14 at room 28 of the Jackmar Motel.

On that date, Ramirez and Kelly came to Biggins' motel room. Ramirez asked to see injection marks on Biggins' arm, searched the motel room, and asked what kind of weapons Biggins had. Biggins informed Ramirez that he had three machine guns and eleven handguns and stated that he wanted at least two ounces of high-grade heroin in exchange therefore.

Ramirez asked to see the weapons, and Biggins took him outside and showed him the weapons in the trunk of his vehicle. Back in the motel room, Ramirez told him he knew of two persons who might be interested in the purchase of the guns. He stated that an individual "by the name of Stevie would be interested in probably the whole package." Mr. Ramirez left the motel room several times during the conversation to make telephone calls and ultimately informed Biggins that he could not set up anything at that time. Ramirez offered to meet with him again the next day and left with Kelly.

Biggins, Ramirez, and Kelly met the next day at the motel room. Ramirez again searched the motel room and stated "I brought you a sample." Ramirez produced a lump of heroin for Biggins to examine. Ramirez took a portion of the heroin, prepared the portion and injected it into his system. Thereafter, Officer Biggins went into the bathroom with the remainder of the sample and pretended to inject it into himself.

Ramirez informed Biggins that they were going to "Stevie's house in Montebello" and told Biggins that his fee for setting up the transaction would be "12 spoons." The three men left the motel room; Ramirez looked at the guns in the trunk once again, and then Ramirez got into Kelly's car, and Biggins followed in his own car. Fellow officers who were keeping the motel room under surveillance followed Biggins to the apartment building in Montebello.

On arrival at the apartment building, Biggins saw that his fellow officers were also there. Biggins, Ramirez, and Kelly went to apartment No. 19 at 852 Mines Street and knocked on the door. The door was opened by Mr. Cornejo, who looked at the officer and said, "How do you like the sample?" Biggins responded that it was satisfactory and Cornejo then opened the door, stepped back, and allowed the three men to enter the apartment.

Shortly after Biggins, Ramirez, and Kelly entered the apartment, Cornejo answered the telephone. After some discussion, he informed Biggins that there were police all around the apartment building. Biggins indicated he did not want to do business under those circumstances and Cornejo reassured him that the apartment was a "cool place," and that the Montebello police "were only good for finding lost dogs and children."

Biggins and Cornejo discussed the weapons; Cornejo expressed a desire to see them, and Biggins and Cornejo went out to the car and looked at the weapons in the trunk.

When Cornejo and Biggins approached Biggins' automobile, Biggins observed Investigator Christ standing by the back of the surveillance camper. Biggins said he did not want to open the trunk until that man was gone, since he could be a police officer. Cornejo looked in the direction of Investigator Christ and said there was no way "he could be a policeman."

After inspecting the guns, Cornejo went to a locker in the back of the carport area where Biggins' car was parked, produced a key, removed a padlock from the lock, and removed a brown shopping bag from the locker. He brought the shopping bag to Biggins, reached in and removed therefrom a plastic baggie containing a brown substance which the officer believed was heroin. The officer looked in the bag and saw several plastic baggies containing a material which appeared to be heroin, and a number of tin foil rolls of pills.

Cornejo then reached into the trunk of the car and brought out all of the weapons, wrapped in a blanket; Biggins carried the paper sack and the two men returned to the apartment. During this walk, Officer Biggins could see that his fellow officers still had the apartment under surveillance.

The two men returned to the apartment, Cornejo examined the weapons, and then Cornejo and the officer took the weapons into a back bedroom. The officer then demanded the two ounces of heroin and Cornejo reached into the paper bag and removed the same plastic bag he had previously shown to Biggins. Biggins examined it and told Cornejo he felt it was "a little light." Cornejo produced a postal scale and the officer weighed the heroin. It weighed slightly under one ounce. Cornejo explained that business had been "very brisk" and that he had only one ounce of heroin on hand. The officer complained that he was being

ripped off and threatened to cancel the transaction. Cornejo then offered the officer two plastic containers which he stated held pure Columbian cocaine, two ounces of it, each worth $3,600 and advised Officer Biggins to hold the two ounces of cocaine until Cornejo could come up with the additional ounce of heroin. He anticipated that he could deliver the heroin the next day.

During the discussions with Mr. Ramirez and Mr. Cornejo, both had inquired about the source of the weapons. Biggins informed them that the weapons were stolen from a police armory in central Los Angeles. After giving Biggins the heroin and cocaine, Cornejo took the brown paper bag into the back bedroom and placed it beside a bed. The officer could see him do this from his vantage point in the living room. The officer then indicated that he wanted to leave. Ramirez stood up to leave with him. Ramirez opened the door and walked outside, followed by Biggins. Biggins stayed near the doorway, making a conscious effort to keep the door open, and signaled to his fellow officers. Ramirez said to Biggins "It's not cool" and indicated that they should go back inside the apartment. Biggins kept the door open two to three feet, and after he gave a predetermined signal to the officers, they ran up to the door. Officer Biggins had gotten a few feet back inside the apartment when the officers arrived. They ran up shouting "Police," with their identification showing and their guns drawn. The officers were not in uniform.

Once inside, the officers placed Cornejo, Ramirez, Kelly, and Biggins, under arrest and in handcuffs.

Biggins informed Officer Fitzgerald that there was more dope in the paper sack in the bedroom and nodded toward it. Fitzgerald testified that the bag was partially opened, and that standing over it he could see the contents. He could see a bag of white tablets which appeared to him to be contraband.

Officer John Fitzgerald testified that he and the other officers and Biggins had arranged a signal which could mean either that the officer was in trouble or that he had probable cause for an arrest and the officers should enter and make the arrest. The signal was that Biggins would put his finger in his ear and make a twisting motion. When that signal was given, Fitzgerald ran toward the door, along with the other officers. When he approached, he had his badge out and he started yelling "Police officers" as soon as he hit the porch area and then said it again when he got inside the house. He entered the apartment with his badge out and

gun drawn. Once inside he said "Freeze, put your hands on your head. Police officers." After all persons in the room had been arrested and handcuffed, Fitzgerald pushed Biggins into the hall area between the bedrooms and asked him if he had the dope. Biggins said "Yes, there's some in my pocket and the rest of it is in the bag," and nodded toward the bag in the bedroom next to a bed. The officer retrieved the guns which had been supplied by Biggins. They were lying on the bedroom floor partially wrapped in a blanket. All of the officers were in "typical undercover" clothing and were not in police uniform. Fitzgerald testified that four other officers entered the apartment with him.

Officer Christ testified that he was one of the officers who arrested the defendants herein. He testified that prior to entering the apartment he knew that there were machine guns and other weapons inside the apartment. He also knew that the weapons were unloaded but fully operable. He knew that Officer Biggins was carrying a weapon which he assumed to be loaded. Before entering the apartment, he was stationed outside, watching the door. In a response to a signal from Officer Biggins, he ran through the doorway, identifying himself as a police officer as he did so. Before coming through the door he stated "Police officers, City of South Gate." The door was ajar before they entered. As he came through the door, he had in his hands his badge, identification, and revolver.

In the kitchen, Officer Christ observed on the sink counter, balloons, a funnel, and a black box. He believed those items were used in the packaging of heroin; he opened the box, and seized all of the items.

The People rested, and the defendants offered the testimony of the informant Ernest Kelly, on behalf of both. In addition, defendant Cornejo took the stand to testify in his own behalf. The details concerning those offers of testimony will be discussed in connection with the issues they raise.

Essentially the same evidence was offered against defendants at trial. No summary of any differences appears warranted by the issues raised on this appeal.

*Violation of Penal Code Section 844*

■ Appellant Cornejo contends that the entry into the apartment by the arresting officers was not made in full compliance with the requirements of Penal Code section 844 and that thus the subsequent arrest and

seizure of evidence were unlawful. Penal Code section 844 provides that a police officer with probable cause to make an arrest may enter through a closed door or window of a house ". . . after having demanded admittance and explained the purpose for which admittance is desired." ■ The California Supreme Court has held that police cannot comply with the absolute minimum required by this section without "(1) knocking or utilizing other means reasonably calculated to give adequate notice of their presence to the occupants and (2) identifying themselves as police officers. (*Greven* v. *Superior Court,* supra, 71 Cal.2d 287, 291-292 [78 Cal.Rptr. 504, 455 P.2d 432].)" (*Duke* v. *Superior Court* (1969) 1 Cal.3d 314 at p. 319 [82 Cal.Rptr. 348, 461 P.2d 628].)

Respondent argues that there was substantial compliance with Penal Code section 844 in that the officers identified themselves as police prior to and during the entry. In *People* v. *Hall* (1971) 3 Cal.3d 992, 997 [92 Cal.Rptr. 304, 479 P.2d 664], the police officer gave notice of his demand for entrance through knocking, and he identified himself as a police officer. "He did not expressly announce that his purpose was to make an arrest. '[I]dentification alone could constitute substantial compliance with section 844 only if the surrounding circumstances made the officer's purpose clear to the occupants or showed that a demand for admittance would be futile.' (*People* v. *Rosales, supra,* 68 Cal.2d at p. 302 [66 Cal.Rptr. 1, 437 P.2d 489].) Where a criminal offense has just taken place within a room, the occupants may reasonably be expected to know the purpose of the police visit and an express statement of purpose may not be necessary. [Citations.]"

(See also *People* v. *Marshall* (1968) 69 Cal.2d 51, 55-56 [69 Cal.Rptr. 585, 442 P.2d 665]; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 665-666 [47 Cal.Rptr. 788, 408 P.2d 116].)

■ However, under the facts of this case we do not believe that even substantial compliance with the terms of Penal Code section 844 was required. Rather, here, the code section does not apply, and requirements of compliance with its terms would serve no purpose. ■ In *People* v. *Solario* (1977) 19 Cal.3d 760, 763 [139 Cal.Rptr. 725, 566 P.2d 627], the Supreme Court summarized the purpose of Penal Code section 844, as had been previously more elaborately explained in *Duke* v. *Superior Court, supra,* 1 Cal.3d 314, 321, as follows: "To determine the section's applicability under the circumstances of this case we must consider its underlying purposes and policies as set forth in *Duke* v. *Superior Court, supra*: '(1) the protection of the privacy of the individual in his home; (2)

the protection of innocent persons who may also be present on the premises where an arrest is made; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice; and (4) the protection of police who might be injured by a startled and fearful householder.' (1 Cal.3d at p. 321, citations omitted.) [¶] None of these policies would be served by requiring compliance with section 844 when an officer has probable cause to believe a burglary is in progress. . . ."

■ In the instant case, a police officer, already possessing sufficient probable cause to make an arrest, and in whose presence a crime had been committed, was already inside the premises. Therefore, there was no need to protect the "privacy of the individual in his home;" nor were there any "innocent persons" present on the premises where the arrest was to be made. Likewise, it is unlikely that the' entry into the home without proper notice would result in a violent confrontation between the occupant and the officers when the police officer on the premises was already expecting their imminent arrival and the arriving officers began announcing their presence and identity on the porch.

In *People* v. *Mack* (1977) 66 Cal.App.3d 839, 852 [136 Cal.Rptr. 283], Officer O'Hare was inside defendant's residence for the purpose of arresting him. Officer Joines, stationed at the rear of the house, "heard grunting, yelling and crashing sounds from inside. Fearing for the safety of his fellow officer, Joines entered the back door." Responding to a contention that Joines' entry was in violation of Penal Code section 844, the court held at pages 853-854: "Officer Joines' entry was likewise justified by the exigencies of the situation. He was privy to the original plan involving O'Hare and Gallardo. Inferentially, he was unaware it had misfired until he heard a commotion in the house. The circumstances known to him justified a belief that his fellow officer within the house was in imminent peril of bodily harm. [Citations.]"

■ In *People* v. *Hill* (1974) 12 Cal.3d 731, 754-755 [117 Cal.Rptr. 393, 528 P.2d 1], the Supreme Court explained: "A warrantless entry of a dwelling is constitutionally permissible where the officers' conduct is prompted by the motive of preserving life and reasonably appears to be necessary for that purpose. [Citations.] And in determining whether an officer acted reasonably we must consider only reasonable inferences which he is entitled to draw from the facts in the light of his experience. [Citations.]" ■ Here, the officer testified that the signal given by Officer Biggins meant either that the transaction was completed and there

was probable cause for an arrest, or that the officer was in trouble. The officers outside the apartment were aware that a large number of weapons had been delivered to the apartment and further that Officer Biggins was armed. The officers may well have believed that ammunition was present on the premises or that Officer Biggins was being held at the point of his own gun. If Officer Biggins was in fact in danger, the requirement that the officers knock on the door, announce their identity and purpose, and demand admittance would undoubtedly add to the officer's peril and serve no salutary purpose.

We conclude that the information known to the surveilling officers created an exigent circumstance which made compliance with Penal Code section 844 unnecessary. The officers' entry was not unlawful.

*Defendant's Arrest Within
the Home*

■ Appellant Cornejo contends that even if the officers' entry was lawful, they had no right to arrest defendant within his home without a warrant, citing *People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333]. The *Ramey* court ruled at page 275: "Where genuine exigencies exist, broad constitutional mandates often give way to the necessity for immediate action, and an arrest is no exception to this rule. But in the absence of a bona fide emergency, or consent to enter, police action in seizing the individual in the home must be preceded by the judicial authorization of an arrest warrant." In *Ramey,* the officers had probable cause to arrest defendant before going to his home and waited approximately three hours prior to effecting the arrest. (*People* v. *Ramey, supra,* at pp. 269-270.) In the instant case, no probable cause existed to arrest defendant Cornejo before the initial entry into his home by Officer Biggins. That entry was made with defendant's consent, and no challenge as to its reasonableness is made on appeal. The probable cause to arrest defendant Cornejo arose while Biggins was on the premises. Appellant contends, therefore, that Officer Biggins should have left the premises and obtained an arrest warrant before returning to the apartment and arresting its occupants. Respondent, on the other hand, argues that exigent circumstances existed which justified the immediate arrest of defendant.

The *Ramey* court, at page 276, provided the following definition: ". . . 'exigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of

evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers."

In the instant case, we must look to the facts known to Officer Biggins, since the decision to give the signal for an arrest was his. By the time the transaction was concluded, Biggins knew that a substantial quantity of narcotics was in the apartment, along with paraphernalia and equipment usually used to prepare narcotics for sale. Cornejo had informed Biggins that business had been "swift," and Biggins may well have assumed that the narcotics would not remain in the apartment much longer. In addition, Biggins must have been concerned about the immediate retrieval of the machine guns and handguns which had been deposited at the defendant's apartment. Taking time to obtain an arrest warrant and return to the apartment may well have resulted in the loss of all of the foregoing evidence and the escape of the suspects.

In *People* v. *Escudero*(1979) 23 Cal.3d 800 [153 Cal.Rptr. 825, 592 P.2d 312], the Supreme Court addressed a *Ramey* challenge by a defendant who had been arrested in his home one hour after he had been seen committing a burglary. The court concluded, at pages 810-811: "Finally, the cases are not distinguishable on the ground, urged by defendant, that the officers herein assertedly had no reason to believe he was armed and dangerous. Throughout the events in question the police were pursuing a man whom they suspected of having broken into an occupied private home in the middle of the night to commit a burglary; this is a serious crime, with an ever present potential for exploding into violent confrontation. The need to prevent the imminent escape of such an offender is clearly an exigent circumstance within the doctrine here invoked."

The *Ramey* court expressly stated that the possible destruction of evidence or escape of suspects may create a sufficient exigency justifying a warrantless arrest within the home. Under the circumstances of this case there was no violation of the *Ramey* mandate and defendant was lawfully arrested.

■ *Appellant Cornejo Contends That
the Trial Court Erred in Denying
His Motion to Sever His Trial From
That of the Codefendant Ramirez*

He argues that severance was required under the holding of *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. The *Aranda*

court held at page 530: "When the prosecutor proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of [three] procedures: . . ." The trial court may delete those portions of the offending statement which implicate the codefendant; it may grant a severance of the trials; or it may exclude the statement altogether. In the instant case, none of the above procedures was followed, and appellant Cornejo contends that he was prejudiced by the following statement of Ramirez: During the first meeting between Ramirez and Biggins, Biggins testified that Ramirez told him that "he knew of another individual, a younger individual by the name of Stevie, who might be interested in the whole package."

Cornejo's first name is Steven and appellant argues that the jury must have understood that the statement referred to him. That conclusion appears inescapable since Steven Cornejo ultimately did take "the whole package."

Appellant does not explain, however, how the introduction of the statement into the trial could possibly have been prejudicial to the defendant Cornejo. The evidence of defendant's interest, complicity, and activity in the transaction in question was overwhelming. ■ In *People v. Romo* (1975) 47 Cal.App.3d 976, 984 [121 Cal.Rptr. 684], the court stated: "It is not *Aranda* error to admit into evidence the admission or confession of one defendant, which reflects his commission of a crime that is revealed by the physical evidence, even though such evidence might reflect on the issue of whether or not the crime was actually committed also by another, who is linked to the offense by evidence other than the confession. In such circumstances, the joint trials have been held eminently proper. [Citation.]" And in *People* v. *Manson* (1976) 61 Cal.App.3d 102 at page 151 [132 Cal.Rptr. 265], the court noted: "The problem confronted by *Aranda* and *Bruton* is typically the case where the only evidence linking the nondeclarant codefendant is the admission of his accomplice."

It seems unlikely that Ramirez's opinion that defendant Cornejo might be interested in the deal can be construed as a confession or admission by Cornejo. If seen as merely a statement of opinion by defendant Ramirez, no requirement of severance or deletion arises. However, even if interpreted as an admission mandating some activity on the part of the trial court, the error in denying the motion for severance, if any, is unquestionably harmless.

## The Striking of the Testimony of
### Defendant Cornejo

Appellant Cornejo took the stand and testified in his own behalf during the hearing on the motion to suppress evidence. The defendant testified generally concerning the physical layout of the apartment, the entry into the apartment of the arresting officers, his own arrest, the fact that the arresting officers entered without consent, and the location of the brown paper bag which was seized by the officers. After defendant testified that the brown paper bag in question had been secreted behind the water bed between the headboard and the rear window of the bedroom, the court asked: "Is it true that there were narcotics in that paper sack?" Following some discussion concerning the materiality of the question, the court posed the question to defendant a second time. Cornejo answered: "With all due respect, I think if I answer that I'd be incriminating myself." The following colloquy occurred.

"THE COURT: Is that your answer?

"THE WITNESS: Yes, sir.

"THE COURT: You refuse to answer the Court's question based upon the ground that your answer may tend to incriminate you?

"THE WITNESS: Yes, Your Honor.

"THE COURT: Very well, you may step down. Call your next witness."

Following objection by counsel for Cornejo, the prosecutor moved to strike all of the defendant's testimony based on his refusal to answer the question. Defense counsel requested permission to continue to examine defendant and the court granted the prosecutor's motion. Defense counsel stated to the court: "Well, may the record reflect I have not had an opportunity to speak to him concerning this? . . . All I am asking is the opportunity to talk to him about what the Court has said. The Court has been speaking without giving me the—

"THE COURT: Counsel, will you call your next witness.

"MR. VILLA: I have no further witnesses, Your Honor."

The court then informed Mr. Villa: "If you wish a five-minute recess, I will give it to you. You may have a conference with your clients [*sic*]. If

he decides he wishes to testify fully, answer the questions, appropriate questions, proper questions put to him, the Court will give him a chance." Thereafter the court granted a five-minute recess and when court reconvened the court asked for argument. The prosecutor moved to introduce into evidence all of the exhibits previously marked for identification, which motion was granted. The court again asked for argument, and the prosecutor submitted the matter. The court then turned to the defense counsel and asked for argument on the motion. Mr. Villa responded: "Yes, we would like to have Mr. Cornejo continue testifying; however, you never inquired of me to do that, Your Honor."

"THE COURT: It is a little late now, counsel. You didn't tell me that he was going to testify, so the matter is at a conclusion, gentlemen."

The effect of the trial judge's orders striking defendant's testimony and preventing defendant from testifying further was to deprive defendant of any opportunity to present evidence in opposition to that offered by the People on the motion to suppress evidence.

■ With respect to the first ruling of the court, ordering defendant to answer the question concerning the contents of the paper bag and striking his testimony on his refusal to do so, the trial judge was correct in his determination that defendant could not properly refuse to answer. The defendant's fear that the answer to the question would incriminate him was not well founded. In *Simmons* v. *United States* (1968) 390 U.S. 377, 394 [19 L.Ed.2d 1247, 1259, 88 S.Ct. 967], the court held that when a defendant testifies in support of a motion to suppress evidence on the grounds of a Fourth Amendment violation, his testimony may not thereafter be used against him at the trial of the action. (See also *People* v. *Douglas* (1977) 66 Cal.App.3d 998, 1003-1006 [136 Cal.Rptr. 358].)

■ Further, when a defendant chooses to testify to matters inconsistent with the evidence presented by the prosecution, he cannot limit the cross-examination to the precise facts to which he testifies. (*People* v. *Teshara* (1904) 141 Cal. 633, 638 [75 P. 338].) He can be cross-examined " ' "with respect to facts or denials which are necessarily implied from the testimony in chief, . . ." ' " (*People* v. *Pike* (1962) 58 Cal.2d 70, 90 [22 Cal.Rptr. 664, 372 P.2d 656].) If a witness refuses to be cross-examined or to answer proper questions on cross-examination the witness' direct testimony may be stricken. (*People* v. *McGowan* (1926) 80 Cal.App. 293, 297 [75 Cal.Rptr. 53].) This includes testimony of a defendant in a criminal proceeding. (*People* v. *Barthel* (1965) 231 Cal.App.2d 827, 834

[42 Cal.Rptr. 290]; see also *People* v. *Hatchcock* (1973) 8 Cal.3d 599, 616 [105 Cal.Rptr. 540].)

However, in this case, the record indicates a strong likelihood that defendant would have answered the question posed by the court and all other questions directed to him on direct or cross-examination, had he been provided with an opportunity to consult with his attorney. As noted, following the five-minute recess granted for that purpose, Cornejo's attorney indicated that he wanted to have Mr. Cornejo continue to testify.

█ It would appear therefore, that the trial judge's original order had been rescinded in favor of his decision to grant defendant an opportunity to consult with his attorney, abandon his position concerning the Fifth Amendment, and continue to testify. The refusal then to allow defendant to testify, in the face of his request to do so, is not supported by any reasons apparent in the record. The deprivation of defendant's right to present evidence in his own behalf and the striking of all his previous testimony, without at least an inquiry concerning defendant's intention to answer all proffered questions, was error.

We now proceed to analyze the impact of this error on defendant's case. To do this, we are aided by the presence in the record of defendant's testimony which was ordered stricken by the court. █ With respect to the issue of violation of Penal Code section 844, defendant testified that immediately prior to the entry of the arresting officers, he was showing Biggins, Ramirez, and Kelly to the door. He opened the door and "there was a .45 at my forehead." Someone said, "Freeze, or [I'm] going to blow your head off." He testified that he immediately put his hands up and did not move. When asked by his attorney whether he saw any badges, he answered "No, I didn't. I was terrified." He testified that he was then pushed up against a far wall by one of the officers. He was handcuffed and placed under arrest. He testified further that he did not give the officers permission to come into his apartment.

Because the defendant's foregoing testimony was stricken, and no other evidence was offered to contradict the testimony on behalf of the prosecution, the trial judge, who obviously believed the police officers, did so without the benefit of opposing testimony. Ordinarily, we would be unable to determine what result the trial court would have reached had it considered defendant's conflicting testimony. In this case, however, because of our conclusion that compliance with Penal Code section 844 was not required herein, consideration of defendant's testimony would

have made no difference. Even assuming that the court accepted as true the defendant's version of the entry by the police, that entry would not have been unlawful.

Defendant's testimony, then, placed the officers lawfully within the apartment, wherein they had a right to seize all evidence in plain view.

█ With respect to defendant's contradictory testimony as to the placement of the brown paper bag, defendant was not convicted of possession of any item within the bag. Even if the judge had believed the defendant and had ordered suppressed the bag and its contents, it would have had no effect on the outcome of the case.

Appellant argues elsewhere in his brief that the search of the contents of the black box found in the kitchen was unreasonable. It may be that defendant intended to offer testimony with respect to this issue. However, neither the black box nor its contents (itemized People's exh. 3-B) were offered in evidence against defendant at the trial. Thus, no harm accrued to defendant as a result of this search nor his inability to testify concerning it.

Therefore, although the court erred in denying the defendant the opportunity to testify in his own behalf, the error was harmless.

### The Exercise of the Informant's Fifth Amendment Privilege

█ At the hearing on the motion to suppress evidence, Ernest Kelly was called as a witness for the defendant. After stating his name, he was asked by defense counsel: "Mr. Kelly, directing your attention to the 15th of July, 1977, were you working with the South Gate Police Department?" The witness answered: "I stand on the Fifth Amendment, refuse to answer on the grounds it may incriminate me." The prosecutor explained to the court that Mr. Kelly was then on federal parole and that it is a parole violation to act as an informant. The court observed that it had no power to grant Mr. Kelly immunity from federal prosecution and concluded that he had the right to assert the Fifth Amendment privilege. The court then asked the witness: "Are you refusing to answer the questions that have been put to you—this last question? THE WITNESS: Yes, I am. THE COURT: And all other questions on the grounds that your answers may tend to incriminate you? THE WITNESS: Yes, I do." The court then excused the witness and quashed the subpoena which had previously been served on him.

Appellants Cornejo and Ramirez both contend that the court erred in this ruling and deprived both appellants of the opportunity to examine this witness and present evidence through him. Appellant Cornejo argues that the court should have made a more intensive inquiry into the basis for the witness' assertion of the privilege before deciding whether his answers would in fact incriminate him.

California Evidence Code section 404 provides: "Whenever the proffered evidence is claimed to be privileged under section 940 [of the Evid. Code], the person claiming the privilege has the burden of showing that the proffered evidence *might* tend to incriminate him; *and the proffered evidence is inadmissible unless it clearly appears to the court that the proffered evidence cannot possibly have a tendency to incriminate the person claiming the privilege.*" (Italics added.)

In the instant case, the court was informed that defendant was on parole and that his role as an informant could result in a parole violation, returning him to federal prison. The witness' participation in the meetings, agreement, and sale was already known to the court through the testimony of the police officers. All relevant questions which would have been posed to him could only have related to his activities as an informant. That information, coupled with the assertion that testifying could result in federal imprisonment, was more than adequate to allow the court to determine the incriminating nature of the proffered evidence. In *Cohen* v. *Superior Court* (1959) 173 Cal.App.2d 61 at page 70 [343 P.2d 286], the court said: " 'To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." ' "

In this case we note that the witness was allowed to assert his Fifth Amendment privilege as to the entire proceedings. "A witness has no right to simply refuse to testify generally either before or after being sworn, the privilege must be asserted as to each question." (*People* v. *Chandler* (1971) 17 Cal.App.3d 798, 805 [95 Cal.Rptr. 146].) However, the court inquired of defendant and determined that he would assert the privilege as to each question posed to him and, as noted above, it appears most likely that he would have done so. In *People* v. *Johnson* (1974) 39 Cal.App.3d 749, 758-760 [114 Cal.Rptr. 545]), the court sanctioned the

holding of a pretestimonial hearing, outside the presence of the jury, wherein the court satisfied itself that the witness could properly invoke the privilege against self-incrimination with respect to a particular event. The court held that there was no need for the questions to be posed individually to the witness in the presence of the jury and for the privilege to be reinvoked.

We believe the same reasoning applies to the facts of this case. The requirement that the defense attorney pose to the witness each question he intended to ask and require that the witness invoke the privilege as to each would create a meaningless ritual. Where, as here, it is apparent that the witness would have offered no testimony in response to questions posed, it is not improper for the trial court to determine that fact in advance and excuse the witness.

*Claim of Error re Severance
by Appellant Ramirez*

██ Appellant contends that the court erred in denying defendant's motion for separate trials. However, the severance motion was made below by counsel for defendant Cornejo. During argument on that motion, counsel for appellant Rameriz stated: "It is not our motion."

Because appellant did not move for severance in the trial court, he waived his right to do so and may not, for the first time on appeal, contend that a severance should have been granted. (*People* v. *Simms* (1970) 10 Cal.App.3d 299, 306 [89 Cal.Rptr. 1]; *People* v. *Amata* (1969) 270 Cal.App.2d 575, 586 [75 Cal.Rptr. 860].) Further, no statements allegedly made by defendant Ramirez were introduced against him by or through defendant Cornejo. Therefore, even had a motion for severance been made by Ramirez, it would have been properly denied by the trial court.

*Error in Jury Verdict*

██ Appellant Ramirez argues that the court erred in accepting from the jury a verdict convicting him of sale of less than one-half ounce of heroin. Appellant contends that the court should have granted defendant's motion to reduce the crime to a violation of section 11550 of the Health and Safety Code, being under the influence of a narcotic substance, there being no showing that defendant ever intended to sell the sample of heroin given to the officer.

The jury acquitted Ramirez of sale of cocaine and receiving stolen property. We agree with appellant that the guilty verdict as to count I, Health and Safety Code section 11352, must have related to the initial transaction wherein Ramirez provided Officer Biggins with a sample of heroin. However, that section does not require *sale* of heroin for its commission. Health and Safety Code section 11352 provides in pertinent part that: "[E]very person who transports, imports into this state, sells, furnishes, administers, or gives away . . . any controlled substance . . . shall be punished . . . ."

Therefore, the jury properly convicted defendant of count I, and there was no error in the court's denial of defendant's motion to reduce the offense.

The judgments of conviction herein are affirmed.

Kingsley, Acting P. J., and Jefferson (Bernard), J., concurred.

The petition of appellant Cornejo for a hearing by the Supreme Court was denied June 27, 1979.