[No. S006538. Sept. 7, 1989.]

THE PEOPLE, Plaintiff and Appellant, v.
SANDY PATTERSON, Defendant and Respondent.

**COUNSEL**

Cecil Hicks, District Attorney, Michael R. Capizzi, Chief Assistant District Attorney, Maurice L. Evans, Assistant District Attorney, Thomas M. Goethals, Thomas J. Borris, Brent Romney, William W. Bedsworth and Randall L. Wilkinson, Deputy District Attorneys, for Plaintiff and Appellant.

Ronald A. Zumbrun, Anthony T. Caso, Laurel E. DeFoe, John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Pat Zaharopoulos and Roy W. Hewitt, Deputy Attorneys General, Michael D. Bradbury, District Attorney (Ventura), and Michael D. Schwartz, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Appellant.

Stephen Gilbert, under appointment by the Supreme Court, for Defendant and Respondent.

Ronald Y. Butler, Public Defender (Orange), Carl C. Holmes and Thomas Havlena, Deputy Public Defenders, Harvey R. Zall, State Public Defender, Michael Pescetta and Philip M. Brooks, Deputy State Public Defenders, as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**KENNARD, J.**—The issue before us is whether the second degree felony-murder doctrine applies to a defendant who, in violation of Health and Safety Code section 11352, furnishes cocaine to a person who dies as a result of ingesting it. We reaffirm the rule that, in determining whether a felony is inherently dangerous to human life under the second degree felony-murder doctrine, we must consider "the elements of the felony in the

abstract, not the particular 'facts' of the case." (*People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647].) While Health and Safety Code section 11352 includes drug offenses other than the crime of furnishing cocaine, which formed the basis for the prosecution's theory of second degree felony murder here, we conclude that the inquiry into inherent dangerousness must focus on the felony of furnishing cocaine, and not on section 11352 as a whole. We further hold that—consistent with the established definition of the term "inherently dangerous to life" in the context of implied malice as an element of second degree murder—a felony is inherently dangerous to life when there is a high probability that its commission will result in death.

We reverse the decision of the Court of Appeal affirming the trial court's ruling that, as a matter of law, the second degree felony-murder doctrine was inapplicable to this case. We direct the Court of Appeal to remand the matter to the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

According to the testimony at the preliminary hearing, victim Jennie Licerio and her friend Carmen Lopez had been using cocaine on a daily basis in the months preceding Licerio's death. On the night of November 25, 1985, the two women were with defendant in his motel room. There, all three drank "wine coolers," inhaled "lines" of cocaine, and smoked "coco puffs" (hand-rolled cigarettes containing a mixture of tobacco and cocaine). Defendant furnished the cocaine. When Licerio became ill, Lopez called an ambulance. Defendant stayed with the two women until the paramedics and the police arrived. The paramedics were unable to revive Licerio, who died of acute cocaine intoxication.

The People filed an information charging defendant with one count each of murder (Pen. Code, § 187), possession of cocaine (Health & Saf. Code, § 11350), and possession of cocaine for sale (Health & Saf. Code, § 11351). Defendant was also charged with three counts of violating Health and Safety Code section 11352, in that he "did willfully, unlawfully and feloniously transport, import into the State of California, sell, furnish, administer, and give away, and attempt to import into the State of California and transport a controlled substance, to wit: cocaine."

Defendant moved under Penal Code section 995 to set aside that portion of the information charging him with murder, contending the evidence presented at the preliminary hearing did not establish probable cause to believe he had committed murder. In opposing the motion, the People did not suggest the murder charge was based on a theory of implied malice.

Instead, they relied solely on the second degree felony-murder doctrine. They argued that by furnishing cocaine defendant committed an inherently dangerous felony, thus justifying application of the rule. The trial court denied the motion. However, when the case was reassigned for trial, the court dismissed the murder charge under Penal Code section 1385.[1] In compliance with Penal Code section 1385's requirement that "[t]he reasons for the dismissal must be set forth in an order entered upon the minutes," the court gave this explanation in its minute order: "Court finds that violation of 11351 H & S and 11352 H & S are not inherently dangerous to human life and on the Courts [sic] own motion orders count 1 of the information dismissed in the interest of justice under section 1385 P.C."[2]

Following the dismissal, defendant entered a negotiated plea of guilty to the three counts of violating Health and Safety Code section 11352. In his written plea form, defendant specifically admitted he had "furnished a controlled substance, to wit: cocaine, knowing it was cocaine." The remaining charges were dismissed, and defendant was placed on probation for three years, with credit for the time he had already spent in custody. The People appealed the dismissal of the murder charge. ▇▇ ▇▇▇▇ (Pen. Code, § 1238, subd. (a)(8).)[3]

The Court of Appeal affirmed the dismissal of the murder count. Based on its review of the applicable decisions of this court, the Court of Appeal felt compelled to analyze Health and Safety Code section 11352 in its entirety (as opposed to only that portion of the statute actually violated in the present case) to determine whether defendant had committed an inherently dangerous felony. The court observed that section 11352 could be violated in various nonhazardous ways, such as transporting or offering to transport controlled substances.[4] As the court said, "The latter acts are

---

[1] The trial court granted the motion only after the *prosecution* had urged the court to dismiss the murder charge, a suggestion which defense counsel vigorously opposed. This development occurred in the following manner: When the case was called for trial, defendant waived a jury. It appears that in an off-the-record conference with both counsel the trial court indicated it did not believe defendant had committed an inherently dangerous felony, and if similar facts were to be presented at trial it would be inclined to grant a defense motion for a judgment of acquittal on the murder charge at the close of the prosecution's case. The parties then went on the record, and the prosecutor suggested that the court dismiss the murder charge on its own motion under Penal Code section 1385, which would allow the People to appeal. (Pen. Code, § 1238, subd. (a)(8).) The defense, anticipating a nonappealable acquittal at trial, unsuccessfully urged the court not to dismiss the murder charge.

[2] The People have not raised any issue pertaining to Health and Safety Code section 11351.

[3] The Court of Appeal properly rejected defendant's contention that his guilty plea had rendered the appeal moot. (*People* v. *Orin* (1975) 13 Cal.3d 937 [120 Cal.Rptr. 65, 533 P.2d 193].)

[4] Health and Safety Code section 11352 provides: "Except as otherwise provided in this division, every person who transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give

obviously not inherently dangerous to human life." While recognizing that the murder charge against defendant rested on his *furnishing* cocaine to the victim, the court concluded that, viewing the statute "in the abstract," a violation of section 11352 could not be characterized as an inherently dangerous felony.

The Court of Appeal reached this conclusion reluctantly. The court noted that consideration of the entire statute, which included offenses unrelated to defendant's conduct, had brought the second degree felony-murder rule "to the brink of logical absurdity." The court suggested that "[i]f the rule is not abolished, it should be codified by the legislature with meaningful guidelines to effectuate its use."

As we shall explain, the Court of Appeal has interpreted our previous decisions in this area too broadly. In determining whether defendant had committed an inherently dangerous felony, the court should have considered only the particular crime at issue, namely, furnishing cocaine, and not the entire group of offenses included in the statute but not involved here. Thus, it is the offense of furnishing cocaine, not the statute as a whole, which must be examined "in the abstract."

## DISCUSSION

### 1. *Second degree felony-murder doctrine*

There is no precise statutory definition for the second degree felony-murder rule.[5]　█　In *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892], we defined the doctrine as follows: "A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder. [Citations.]"　█　In determining whether the felony is inherently dangerous, "we look to the

---

away, or attempts to import into this state or transport (1) any controlled substance specified in subdivision (b), (c), or (e), or paragraph (1) of subdivision (f) of Section 11054, specified in paragraph (14), (15), or (20) of subdivision (d) of Section 11054, or specified in subdivision (b), (c), or (g) of Section 11055, or (2) any controlled substance classified in Schedule III, IV, or V which is a narcotic drug, unless upon the written prescription of a physician, dentist, podiatrist, or veterinarian licensed to practice in this state, shall be punished by imprisonment in the state prison for three, four, or five years." Cocaine is one of the numerous drugs covered by the statute. (Health & Saf. Code, § 11054, subd. (f)(1).)

[5]Penal Code section 189 provides in relevant part: "All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree."

elements of the felony in the abstract, not the particular 'facts' of the case." (*People* v. *Williams, supra,* 63 Cal.2d 452, 458, fn. 5; *People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]; *People* v. *Henderson* (1977) 19 Cal.3d 86, 93 [137 Cal.Rptr. 1, 560 P.2d 1180]; *People* v. *Burroughs* (1984) 35 Cal.3d 824, 829-830 [201 Cal.Rptr. 319, 678 P.2d 894].)

The Court of Appeal's opinion in this case criticized the second degree felony-murder rule in its present form, suggesting the doctrine should either be completely eliminated or considerably "reformed." In response, defendant and amici curiae on his behalf have urged us to abolish the rule. The People and their amici curiae, on the other hand, have asked that we "reform" the doctrine by looking solely to the actual conduct of a defendant, thereby dispensing with the requirement that the elements of the offense be viewed in the abstract. We decline both invitations for the reasons discussed below.

The second degree felony-murder doctrine has been a part of California's criminal law for many decades. (See *People* v. *Wright* (1914) 167 Cal. 1, 5 [138 P. 349]; Pike, *What Is Second Degree Murder in California* (1936) 9 So.Cal.L.Rev. 112, 118-119.) In recent years, we have characterized the rule as "anachronistic" (*People* v. *Burroughs, supra,* 35 Cal.3d at p. 829) and "disfavored" (*People* v. *Henderson, supra,* 19 Cal.3d at p. 92), based on the view of many legal scholars that the doctrine incorporates an artificial concept of strict criminal liability that "erodes the relationship between criminal liability and moral culpability." (*People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Satchell* (1971) 6 Cal.3d 28, 33 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].) The Legislature, however, has taken no action to alter this judicially created rule, and has declined our more recent suggestion in *People* v. *Dillon* (1983) 34 Cal.3d 441, 472, footnote 19 [194 Cal.Rptr. 390, 668 P.2d 697], that it reconsider the rules on first and second degree felony murder and misdemeanor manslaughter. In this case, our limited purpose in granting the People's petition for review was to determine the applicability of the second degree felony-murder doctrine to the crime of furnishing cocaine. We decline defendant's invitation that we determine the continued vitality of the rule. (See *People* v. *Burroughs, supra,* 35 Cal.3d at p. 829, fn. 3.)

We also turn down the People's invitation that we expand the second degree felony-murder doctrine by eliminating the requirement of *People* v. *Williams, supra,* 63 Cal.2d 452, that the elements of the offense be viewed "in the abstract," and by adopting a new standard focusing instead on the actual conduct of a defendant in determining whether the felony is inherently dangerous.

In *People* v. *Williams, supra,* 63 Cal.2d 452, the defendants argued with their drug dealer and stabbed him to death, assertedly in self-defense. We reversed the convictions for second degree murder because of the trial court's improper instruction to the jury that the defendants were guilty of second degree murder if the jury found the killing had occurred in the perpetration of the felony of conspiracy to possess Methedrine without a prescription. We explained that, in evaluating the inherent dangerousness of a particular felony, "we look to the elements of the felony in the abstract, not the particular 'facts' of the case." (*Id.,* at p. 458, fn. 5.) We concluded that under this analysis the conspiracy involved in *Williams* was not a felony inherently dangerous to human life. (*Id.,* at p. 458.)

Sound reasons support the *Williams* rule. As we observed in *People* v. *Burroughs, supra,* 35 Cal.3d at page 830: "This form of [viewed-in-the-abstract] analysis is compelled because there is a killing in every case where the rule might potentially be applied. If in such circumstances a court were to examine the particular facts of the case prior to establishing whether the underlying felony is inherently dangerous, the court might well be led to conclude the rule applicable despite any unfairness which might redound to the defendant by so broad an application: the existence of the dead victim might appear to lead inexorably to the conclusion that the underlying felony is exceptionally hazardous."

For the reasons set forth above, we are reluctant to significantly expand the scope of the second degree felony-murder rule, as the People have urged us to do. We have repeatedly said that the felony-murder rule "deserves no extension beyond its required application." (*People* v. *Phillips, supra,* 64 Cal.2d at p. 582; *People* v. *Dillon, supra,* 34 Cal.3d at pp. 462-463; *People* v. *Burroughs, supra,* 35 Cal.3d at p. 829.) Both the People's suggestion that we expand the second degree felony-murder doctrine and defendant's suggestion that we abolish it are matters appropriately left to the Legislature.

*2. Determining "inherent dangerousness" of the felony of furnishing cocaine*

As discussed earlier, in determining whether defendant committed an inherently dangerous felony, we must consider the elements of the felony "in the abstract." (*People* v. *Williams, supra,* 63 Cal.2d 452, 458, fn. 5.) ██ Because Health and Safety Code section 11352 also proscribes conduct other than that involved here (furnishing cocaine), the issue still to be resolved is whether we must consider only the specific offense of furnishing cocaine or the entire scope of conduct prohibited by the statute.

The Court of Appeal examined Health and Safety Code section 11352 in its entirety. It felt compelled to do so because of a series of recent cases

where we held that, to determine a felony's inherent dangerousness, the statute as a whole had to be examined. (*People* v. *Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372]; *People* v. *Henderson, supra,* 19 Cal.3d 86; *People* v. *Burroughs, supra,* 35 Cal.3d 824.) However, unlike the situation here, each of those cases involved a statute that proscribed an essentially single form of conduct.

In *Lopez, supra,* 6 Cal.3d 45, the defendant and another inmate engaged in what initially was a nonviolent escape, but which culminated in a fatal assault perpetrated by the other escaping inmate. We held the crime of escape (Pen. Code, § 4532) not to be an inherently dangerous felony for purposes of applying the second degree felony-murder rule. We rejected the People's contention that because the statute's penalty for a violent escape was greater than for a nonviolent escape it could be broken into two offenses: one violent, the other nonviolent. Although we recognized that the statute "comprehends a multitude of sins," we concluded it "draws no relevant distinction between such [nonviolent] escapes and the more violent variety . . . ." (6 Cal.3d at pp. 51-52.) In stressing the statute's unitary nature, we said: "The offense is *escape.* The circumstances of commission are relevant not to the offense committed but to the punishment to be imposed therefor." (*Id.,* at p. 52, fn. 9, italics in original.)

In *Henderson, supra,* 19 Cal.3d 86, the defendant was accused of murder based on a death that had occurred in the course of aggravated false imprisonment. (Pen. Code, § 236.) The crime was a felony because it had been "effected by violence, menace, fraud, or deceit." (Pen. Code, § 237.)[6] After analyzing the statutory scheme as a whole, we concluded: "While the elements of violence or menace by which false imprisonment is elevated to a felony may involve danger to human life, the felony offense viewed as a whole in the abstract is not inherently dangerous to human life." (19 Cal.3d at p. 94.) In rejecting the People's contention that, instead of examining the statute as a whole, we consider whether the felony of false imprisonment by violence or menace was inherently dangerous, we said: "The Legislature has not drawn any relevant distinctions between violence, menace, fraud, or deceit. These types of conduct are specified only as a basis for distinguishing between false imprisonment punishable as a misdemeanor and false imprisonment punishable as a felony." (*Id.,* at p. 95.)

Finally, in *Burroughs, supra,* 35 Cal.3d 824, we held that a violation of Business and Professions Code section 2053, which prohibits the practice of

---

[6] Penal Code section 236 reads: "False imprisonment is the unlawful violation of the personal liberty of another." When we decided *Henderson,* Penal Code section 237 provided: "False imprisonment is punishable by fine not exceeding five hundred dollars, or by imprisonment in the county jail not more than one year, or by both. If such false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment in the state prison for not less than one nor more than ten years."

medicine without a license "under circumstances or conditions which cause or create a risk of great bodily harm, serious physical or mental illness, or death," was not a felony inherently dangerous to human life.[7] We explained: "In this examination we are required to view the statutory definition of the offense as a whole, taking into account even nonhazardous ways of violating the provisions of the law which do not necessarily pose a threat to human life. [¶] The primary element of the offense in question here is the practice of medicine without a license. The statute defines such practice as 'treating the sick or afflicted.' One can certainly conceive of treatment of the sick or afflicted which has quite innocuous results—the affliction at stake could be a common cold, or a sprained finger, and the form of treatment an admonition to rest in bed and drink fluids or the application of ice to mild swelling. Thus, we do not find inherent dangerousness at this stage . . . ." (35 Cal.3d at p. 830.)

In both *Henderson* and *Burroughs, supra,* we observed that the offense in question had a "primary element." In *Henderson,* the primary element was "the unlawful restraint of another's liberty" (*People* v. *Henderson, supra,* 19 Cal.3d at p. 93), while in *Burroughs* it was "the practice of medicine without a license" (*People* v. *Burroughs, supra*, 35 Cal.3d at p. 830). *Lopez,* too, involved an offense with a primary element, namely, escape. (6 Cal.3d 45.) In contrast, Health and Safety Code section 11352, the statute at issue here, has no primary element. For instance, the elements of the crime of transporting a controlled substance bear no resemblance to those underlying the offense of administering such a substance; yet these two offenses are included in the same statute. (Compare *People* v. *Cortez* (1985) 166 Cal.App.3d 994, 998-999 [212 Cal.Rptr. 692] [transporting]; CALJIC No. 12.07 [administering].)

The fact that the Legislature has included a variety of offenses in Health and Safety Code section 11352 does not require that we treat them as a unitary entity. Rather, we must decide whether in "[r]eading and considering the statute as a whole in order to determine the true legislative intent . . . we find [a] basis for severing" the various types of conduct it forbids.

---

[7]Business and Professions Code section 2053 provides: "Any person who willfully, under circumstances or conditions which cause or create risk of great bodily harm, serious physical or mental illness, or death, practices or attempts to practice, or advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked and unsuspended certificate as provided in this chapter, or without being authorized to perform that act pursuant to a certificate obtained in accordance with some other provision of law, is punishable by imprisonment in the county jail for not exceeding one year or in the state prison. [¶] The remedy provided in this section shall not preclude any other remedy provided by law."

(*People* v. *Henderson, supra,* 19 Cal.3d at p. 95.) There are more than 100 different controlled substances that fall within the confines of Health and Safety Code section 11352. To create statutes separately proscribing the importation, sale, furnishing, administration, etc., of each of these drugs, would require the enactment of hundreds of individual statutes. It thus appears that for the sake of convenience the Legislature has included the various offenses in one statute.

The determination whether a defendant who furnishes cocaine commits an inherently dangerous felony should not turn on the dangerousness of other drugs included in the same statute, such as heroin and peyote; nor should it turn on the danger to life, if any, inherent in the transportation or administering of cocaine. Rather, each offense set forth in the statute should be examined separately to determine its inherent dangerousness.

For the reasons discussed above, we hold the Court of Appeal and the trial court erred in concluding that Health and Safety Code section 11352 should be analyzed in its entirety to determine whether, in furnishing cocaine, defendant committed an inherently dangerous felony. Defendant, however, argues that even the more narrow offense of furnishing cocaine is not an inherently dangerous felony and therefore the trial court acted correctly in dismissing the murder charge, despite its faulty analysis. In countering that argument, the People have asked us to take judicial notice of various medical articles and reports that assertedly demonstrate that the offense of furnishing cocaine is sufficiently dangerous to life to constitute an inherently dangerous felony.

The task of evaluating the evidence on this issue is most appropriately entrusted to the trial court, subject, of course, to appellate review. We therefore direct the Court of Appeal to remand the matter to the trial court for further proceedings in light of this opinion. This remand does not foreclose a finding by the trial court that the crime of furnishing cocaine is not a felony inherently dangerous to life, thus justifying a dismissal of the murder charge. If, however, the trial court concludes the offense of furnishing cocaine is inherently dangerous and therefore the murder charge should not be dismissed, defendant must be allowed to withdraw his guilty plea to the charges of violating Health and Safety Code section 11352, with credit for any interim time served. (See *People* v. *Orin, supra,* 13 Cal.3d at p. 942, fn. 7.)

3. *Meaning of the term "inherently dangerous to human life"*

For the guidance of the trial court on remand, we shall elaborate on the meaning of the term "inherently dangerous to life" for purposes of the second degree felony-murder doctrine.

The felony-murder rule generally acts as a substitute for the *mental state* ordinarily required for the offense of murder. We observed in *People v. Satchell, supra,* 6 Cal.3d at page 43: "Under well-settled principles of criminal liability a person who kills—whether or not he is engaged in an independent felony at the time—is guilty of murder *if he acts with malice aforethought.* The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state—and thereby to render irrelevant evidence of actual malice or the lack thereof—when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it." Ordinarily, when a defendant commits an unintentional killing, a murder conviction requires a showing that he acted with implied malice. (Pen. Code, § 188.) With the felony-murder rule, however, such malice need not be shown. (See *People v. Dillon, supra,* 34 Cal.3d 441, 475.)

■ Implied malice, for which the second degree felony-murder doctrine acts as a substitute,[8] has both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." (*People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." (*Ibid.,* internal quotation marks omitted.)

The second degree felony-murder rule eliminates the need for the prosecution to establish the *mental* component. The justification therefor is that, when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life because, by declaring the conduct to be felonious, society has warned him of the risk involved. The *physical* requirement, however, remains the same; by committing a felony inherently dangerous to life, the defendant has committed "an act, the natural consequences of which are dangerous to life" (*Watson, supra,* 30 Cal.3d at p. 300), thus satisfying the physical component of implied malice.

■ The definition of "inherently dangerous to life" in the context of the implied malice element of second degree murder is well established. An

---

[8] Although the second degree felony-murder doctrine operates as a substitute for implied malice, this does not mean that the doctrine results in a "conclusive presumption" of malice. (See *People v. Dillon, supra,* 34 Cal.3d at p. 475.) Nevertheless, in determining the proper scope of the second degree felony-murder doctrine, it is appropriate for the courts, in recognition of the Legislature's authority to define criminal offenses, to attempt to minimize the disparity between the legislatively created and the judicially recognized categories of second degree murder.

act is inherently dangerous to human life when there is "a *high probability* that it will result in death." (*People* v. *Watson, supra,* 30 Cal.3d at p. 300, italics added; see also *People* v. *Davenport* (1985) 41 Cal.3d 247, 262 [221 Cal.Rptr. 794, 710 P.2d 861]; *People* v. *Poddar* (1974) 10 Cal.3d 750, 757 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Conley* (1966) 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Washington, supra,* 62 Cal.2d 777, 782; *People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1].)

We therefore conclude—by analogy to the established definition of the term "dangerous to life" in the context of the implied malice element of second degree murder (see *People* v. *Watson, supra,* 30 Cal.3d 290)—that, for purposes of the second degree felony-murder doctrine, an "inherently dangerous felony" is an offense carrying "a high probability" that death will result. A less stringent standard would inappropriately expand the scope of the second degree felony-murder rule reducing the seriousness of the act which a defendant must commit in order to be charged with murder.[9]

We share the concern Chief Justice Lucas has expressed in his dissent regarding the tragic effects that the abuse of illegal drugs, particularly "crack" cocaine, has on our society. However, it is the Legislature, rather than this court, that should determine whether expansion of the second degree felony-murder rule is an appropriate method by which to address this problem. In the absence of specific legislative action, we must determine the scope of the rule by applying the established definition of inherent dangerousness.

## DISPOSITION

We reverse the decision of the Court of Appeal, and direct that court to remand the matter to the trial court for further proceedings consistent with this opinion.

**LUCAS, C. J.,** Concurring and Dissenting— ▮▮▮▮ I concur in the judgment. As several prior cases have indicated, the second degree felony-murder doctrine performs a valuable function in deterring the commission of crimes which, though involving no express or implied malice, are nonetheless so inherently dangerous as to justify a murder charge when a death occurs during their commission. (See *People* v. *Mattison* (1971) 4 Cal.3d 177, 185 [93 Cal.Rptr. 185, 481 P.2d 193] [furnishing methyl alco-

---

[9] We are aware that, in enacting the first degree felony-murder rule, the Legislature has determined that deaths occurring in the commission of certain felonies are punishable as first degree murder. (Pen. Code, § 189.) The fact that the Legislature has chosen to single out those offenses in this fashion, however, provides no guidance on the appropriate reach of the second degree felony-murder doctrine in general. As noted earlier, the Legislature of course has the authority to expand or to abolish the second degree felony-murder doctrine.

hol]; *People* v. *Taylor* (1970) 11 Cal.App.3d 57, 63 [89 Cal.Rptr. 697] [furnishing heroin].) Accordingly, the majority quite properly refuses to accept defendant's invitations (1) to abrogate the doctrine entirely, or (2) to permit consideration of other felonies not involved in the case in determining the inherent dangerousness of the defendant's own offense.

I dissent, however, to the majority's unrealistic, unwise and unprecedented definition of inherent dangerousness as involving "a high probability of death." With that one broad, gratuitous stroke, the majority has precluded application of the second degree felony-murder doctrine to most, if not all, drug furnishing offenses (as well as many nondrug offenses), thereby overruling or disapproving, sub silentio, several prior cases of this court and the Court of Appeal. (E.g., *People* v. *Poindexter* (1958) 51 Cal.2d 142, 149 [330 P.2d 763] [furnishing narcotics to minor]; *People* v. *Taylor* (1980) 112 Cal.App.3d 348 [169 Cal.Rptr. 290] [furnishing heroin]; *People* v. *Taylor, supra,* 11 Cal.App.3d 57, 59 [same]; *People* v. *Cline* (1969) 270 Cal.App.2d 328, 331-332 [75 Cal.Rptr. 459, 32 A.L.R.3d 582] [furnishing phenobarbital].)

Each of the foregoing cases held that a second degree murder charge could be founded upon the furnishing of illegal, dangerous drugs. No mention whatever was made of any need to show a "high probability" of death in those cases. The courts therein simply concluded that *an inherent danger to life* was sufficient to warrant a felony murder charge. As we stated in *Poindexter, supra,* "Here there was uncontroverted testimony that Callies died from narcotics poisoning, and that taking a shot of heroin was *an act dangerous to human life.*" (51 Cal.2d at p. 149, italics added.)

Because the drug furnishing statutes must be viewed *in the abstract* for purposes of applying the second degree felony-murder doctrine, as a practical matter the majority's new "high probability" requirement will be impossible to satisfy in any case arising under those statutes, for to my knowledge none of them involves drugs so dangerous that death is a *highly probable* result. At a time when our society faces a serious "crack" cocaine crisis of epidemic proportions, the majority's holding is particularly unwelcome. I note that neither defendant nor the People urged adoption of the "high probability" standard—the issue remained unbriefed throughout the appeal process.

We recently set forth in *People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894], another second degree felony-murder case, the correct and proper test for determining the inherent dangerousness of an offense. There, we referred to a felony "inherently so dangerous that by its very nature, it cannot be committed without creating *a substantial risk*

that someone will be killed . . . ." (*Id*. at p. 833, italics added.) This formulation was not the creation of the *Burroughs* court. As one commentator has observed, citing English cases from 1887 and 1898, at common law the second degree felony-murder rule was "limited by the requirement that the commission of a felony involve *substantial human risk* . . . ." (Pike, *What Is Second Degree Murder in California* (1936) 9 So.Cal.L.Rev. 112, 118, fn. omitted.)

Applying the foregoing test in the context of a drug furnishing offense, the relevant question would be whether furnishing a particular drug such as cocaine or heroin created a substantial risk of death. Although that test may be difficult for the prosecution to meet, the majority's alternative test will entirely foreclose the possibility of a murder charge in all of these cases.

As I have indicated, the purpose of the felony-murder rule is to *deter* the commission of inherently dangerous felonies. Certainly that purpose is furthered by deterring offenses bearing a substantial risk of death, as well as those offenses involving a greater likelihood of death. As the court in a similar case (involving heroin furnishing) explained, "knowledge that the death of a person to whom heroin is furnished *may* result in a conviction for murder should have some effect on the defendant's readiness to do the furnishing." (*People* v. *Taylor, supra,* 11 Cal.App.3d 57, 63, italics added, quoted by us with approval in *People* v. *Mattison, supra,* 4 Cal.3d 177, 185.)

The majority indicates that its "high probability of death" standard was borrowed from second degree murder cases (e.g., *People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279]) requiring proof of implied malice. Such a standard may be appropriate for measuring whether defendant's general course of conduct should warrant a murder charge based on implied malice, but it is singularly inappropriate for determining whether *felonious* conduct should lead to such a charge. Notions of implied malice have never before been imported into felony murder, where the commission of the felony itself acts as a substitute for malice.

The anomalous and inconsistent nature of the majority's holding is confirmed by the fact that a defendant can be charged with *first* degree felony murder by committing such offenses as burglary, robbery, rape or child molestation (see Pen. Code, § 189), none of which offenses, viewed in the abstract, involves a high probability of death, although each of which may present substantial risks of death. If a first degree murder charge can be based on an offense not involving a high probability of death, surely the lesser charge of second degree murder can be based on similar offenses, so long as the requisite substantial risk of death can be demonstrated.

For all the foregoing reasons, I dissent to the majority's improper new formulation of the standard for determining inherent dangerousness.

Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I dissent.

██ ██ In determining whether the death in this case resulted from a felony inherently dangerous to human life, the majority attempt to draw a distinction between (1) a statute that proscribes a single course of criminal conduct that can be committed in different ways, and (2) a statute that groups together, for legislative convenience, a number of related but distinct crimes. The majority then put Health and Safety Code section 11352 (hereafter section 11352) into the latter category, carve out of its provisions the assertedly distinct felony of "furnishing cocaine," and ask the trial court to decide whether "furnishing cocaine" is a felony inherently dangerous to human life.

In my view, however, the correct question is whether *a violation of section 11352*—not merely "furnishing cocaine"—is a felony inherently dangerous to human life. And the trial court has already answered that question: after reviewing our decisions on the topic, the trial court ruled that *"violating section [11352] of the Health and Safety Code* [is] not so inherently dangerous that, by its very nature, it cannot be committed without creating a substantial risk that someone will be killed. And, while the felonies [charged in the case at bar] may, in many circumstances, pose a threat to human life, *the commission of the crime as defined by the statute* does not inevitably pose a danger to human life." (Italics added.) The court therefore dismissed the murder count at the invitation of the prosecutor and in the interest of justice. As will appear, our precedents amply support the court's ruling.

Shortly after this court adopted the requirement that to determine whether a felony is inherently dangerous to human life "we look to the elements of the felony in the abstract" (*People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647]), we first confronted an attempt to depart from the statutory definition of the felony. In *People* v. *Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353], the defendant, a chiropractor, persuaded the parents of a child with eye cancer to renounce planned surgery and allow him to treat her instead by chiropractic methods, charging them for his services. When the child died the defendant was convicted of second degree felony murder, the felony being grand theft in violation of Penal Code section 484. We held that it was prejudicial error to predicate a felony-murder instruction on that offense. The Attorney General conceded that grand theft as defined in section 484 was not inherently

dangerous to human life, but urged us to look at "the entire course of defendant's conduct" and to characterize the crime as "grand theft medical fraud": "this newly created 'felony,' he urges, clearly involves danger to human life and supports an application of the felony-murder rule." (64 Cal.2d at p. 583.)

We rejected this attempt to "abandon the statutory definition of the felony as such" (64 Cal.2d at p. 583), explaining that "To fragmentize the 'course of conduct' of defendant so that the felony-murder rule applies if any segment of that conduct may be considered dangerous to life would widen the rule beyond calculation." (*Id.* at pp. 583-584.) We concluded that "once the Legislature's own definition is discarded, the number or nature of the contextual elements which could be incorporated into an expanded felony terminology would be limitless. We have been, and remain, unwilling to embark on such an uncharted sea of felony murder." (*Id.* at p. 584.)

The claim we rejected in *Phillips,* of course, was analytically the converse of the claim made in the case at bar: in *Phillips* the Attorney General sought to *expand* the statutory definition of the felony by including elements ("medical fraud") not incorporated therein by the Legislature; here the Attorney General seeks instead to *contract* the statutory definition by excluding elements (the transportation, importation, sale, etc., of controlled substances) that the Legislature did incorporate therein. But the reasoning of *Phillips*—that to abandon the statutory definition of the felony would embark us on "an uncharted sea of felony murder"—remains no less applicable to the present context.

The first case to so reason on facts similar to those now before us was *People* v. *Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372]. There the defendant and a confederate perpetrated an escape from county jail that began nonviolently but ended in a violent and fatal assault. The defendant was convicted of second degree felony murder, the felony being escape in violation of Penal Code section 4532. Again we held it prejudicial error to predicate a felony-murder instruction on the offense in question. We began by emphasizing (6 Cal.3d at p. 50) that Penal Code section 4532 makes felonious "a great variety" of acts falling generally into the category of escapes from county or city custody, and prescribes penalties depending on whether the defendant's conduct was violent or nonviolent.

In determining whether the felony in issue was inherently dangerous to human life, we then considered the entire statutory definition and the wide range of acts it prohibited: "the crime of escape proscribed by Penal Code section 4532 comprehends a multitude of sins. It applies to the man who is tardy in returning from a work furlough as well as to the man who obtains a

contraband weapon and decides to shoot his way out of jail. It applies to the committed inebriate who wanders off from a county road job in search of drink as well as to the desperate felon who seizes a hostage in order to bargain for his freedom. It applies to those who, like this defendant, fashion a rope from blankets, climb down it, and steal into the woods as well as to those who strangle a guard to obtain his key." (6 Cal.3d at p. 51.) We reasoned that the nonviolent acts prohibited by the statute cannot logically support an imputation of malice aforethought, and concluded (*id*. at pp. 51-52): "Because *section 4532 draws no relevant distinction* between such escapes and the more violent variety, it proscribes an offense which, considered in the abstract, is not inherently dangerous to human life" (italics added and deleted, fn. omitted).

In *People* v. *Henderson* (1977) 19 Cal.3d 86 [137 Cal.Rptr. 1, 560 P.2d 1180], the defendant restrained one Reinesto at gunpoint, believing he had stolen the defendant's television set; when Reinesto made a sudden evasive movement, the gun discharged and fatally wounded a third person. The defendant was convicted of second degree felony murder, the felony being false imprisonment in violation of Penal Code sections 236 and 237. Again we held it prejudicial error to predicate a felony-murder instruction on that offense. Section 236 generally defines false imprisonment as "the unlawful violation of the personal liberty of another"; section 237 makes the offense a misdemeanor, but elevates it to a felony if it is effectuated by "violence, menace, fraud, or deceit."

We first reasoned that false imprisonment as generally defined in Penal Code section 236 is not inherently dangerous to human life, noting that it can be committed by words alone. Turning to felony false imprisonment as defined in Penal Code section 237, we found it manifest that the four factors that can elevate the offense to a felony "do not all involve conduct which is life endangering." (19 Cal.3d at p. 94.) Because fraud and deceit present no such danger, we concluded that "While the elements of violence or menace by which false imprisonment is elevated to a felony may involve danger to human life, the felony offense *viewed as a whole in the abstract* is not inherently dangerous to human life." (*Ibid.*, italics added.) We thus deemed the crime to be "similar to those general offenses embracing a variety of conduct both violent and nonviolent which we have held not to be inherently dangerous to human life" (*ibid.*), citing *People* v. *Lopez, supra,* 6 Cal.3d 45.

We then drove the point home by rejecting the People's contention that we should consider separately an offense denominated "false imprisonment by violence or menace." Such an approach, we explained (19 Cal.3d at p. 95), presumes a legislative intent that the second sentence of Penal Code

section 237 "proscribes not one, but four separate felonies depending upon the means by which false imprisonment is effected."[1] Viewing section 237 as a whole, however, we could find no basis for thus severing the crime of "false imprisonment by violence or menace" from the conduct prohibited by the statute: we reasoned (19 Cal.3d at p. 95, italics added), "The Legislature has not drawn any relevant distinctions between violence, menace, fraud, or deceit. . . . Most significantly, the Legislature has not distinguished between false imprisonment effected by violence or menace on the one hand and false imprisonment effected by nonviolent methods of fraud or deceit on the other. The Legislature has not evinced a particular concern for violent as opposed to nonviolent acts of false imprisonment *by separate statutory treatment, proscription, or punishment.*"

Our most recent case in this series was *People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894]. Citing the foregoing decisions, we reaffirmed (at p. 830) that our task is to "determine whether the felony, taken in the abstract, is inherently dangerous to human life [citation], or whether it possibly could be committed without creating such peril." And we reiterated (*ibid.*, italics added) that "In this examination we are required to *view the statutory definition of the offense as a whole,* taking into account even nonhazardous ways of violating the provisions of the law which do not necessarily pose a threat to human life." Applying this rule to the statute in issue in *Burroughs,* we held it prejudicial error to predicate a second degree felony-murder instruction on a violation of Business and Professions Code section 2053 (felony practicing medicine without a license). (Accord, *People* v. *Caffero* (1989) 207 Cal.App.3d 678, 683 [255 Cal.Rptr. 22] [felony child endangering].)

The majority seek to distinguish the foregoing authorities on the ground that in each the statute nevertheless defines an offense having a "primary element." (Maj. opn., *ante,* p. 624.) The majority characterize the "primary element" in *Lopez* as escape, in *Henderson* as the unlawful restraint of liberty, and in *Burroughs* as the practice of medicine without a license. The majority then contend there is no such "primary element" in section 11352, but their argument in support is unpersuasive. They assert, for example, that "the elements of the crime of transporting a controlled substance bear no resemblance to those underlying the offense of administering such a substance" (maj. opn., *ante,* p. 624). On the contrary, the elements of the two offenses are essentially identical: the prosecution must prove that (1)

---

[1] At the time in question Penal Code section 237 read in its entirety, "False imprisonment is punishable by fine not exceeding five hundred dollars, or by imprisonment in the county jail not more than one year, or by both. If such false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment in the state prison for not less than one nor more than ten years."

the defendant either transported or administered a controlled substance; (2) the defendant knew that the substance transported or administered was a controlled substance; and (3) the quantity transported or administered was sufficient to be used as a controlled substance. (See CALJIC No. 12.02 (5th ed. 1988) and Use Note.)[2]

Stressing that "more than 100 different controlled substances" are incorporated by reference into section 11352, the majority next argue that to separately prohibit the acts of transporting, importing, selling, furnishing, administering, etc., each of those drugs "would require the enactment of hundreds of individual statutes." (Maj. opn., *ante*, p. 625.) From this premise the majority infer that the Legislature included all such offenses in section 11352 simply "for the sake of convenience." (*Ibid.*)

The majority's reference to the "100 different controlled substances" is, of course, a red herring: nothing actually turns on that fact. For example, Health and Safety Code section 11360 is a parallel statute whose operative wording is identical to section 11352: it, too, prohibits the acts of transporting, importing, selling, furnishing, administering, etc., a drug—but it applies only to one substance, marijuana. If a similar case were to arise under section 11360 (e.g., an accidental death following the furnishing and ingestion of an excessive quantity of marijuana), I cannot believe the majority would refuse to apply today's holding that "each offense set forth in the statute should be examined separately to determine its inherent dangerousness." (Maj. opn., *ante*, p. 625.)[3]

Equally unpersuasive is the majority's conclusion that the Legislature chose the present wording of section 11352 simply "for the sake of convenience." This is sheer speculation, easily outweighed by rational inferences that we can and should draw under settled rules of statutory construction. Those rules are primarily two: section 11352 must be viewed in the light of both its history and its context. When so viewed, it will be seen as a deliberately crafted response by the Legislature to a single evil: trafficking in illegal narcotics.

---

[2] The majority cite CALJIC No. 12.07; but that ancillary instruction merely *defines* one of the terms ("administer") of the primary instruction, CALJIC No. 12.02—it does not purport to prescribe an additional *element* of the crime itself.

[3] At the cost of mixing metaphors, I add that the majority's reference to the "100 different controlled substances" is also a straw man: defendant does not contend that the dangerousness of the violation of section 11352 in this case should be judged, for example, by reference to a relatively benign medication such as codeine, which is listed among the 100. (Health & Saf. Code, § 11055, subd. (b)(1)(H)). Both the complaint and the information charged defendant specifically with transporting, importing, selling, furnishing, administering, etc., "a controlled substance, to wit: cocaine."

This fact first emerges from the legislative history. Section 11352 punishes "every person who transports, imports into this state, sells, furnishes, administers, or gives away" or who offers to do any of the above, or who attempts to import or transport, any of certain controlled substances without a valid prescription. The first lesson we learn from the legislative history is that this list of prohibited acts is deliberate, in the sense that the Legislature adopted the list in its entirety when it first enacted section 11352, rather than piecemeal over the years. We do not deal here with "legislation by accretion," a common process in which the Legislature first enacts a statute forbidding act A, then amends the statute from time to time to add prohibitions against acts B, C, and D, etc. (See, e.g., Pen. Code, §§ 459 [burglary], 496 [receiving stolen property].) By contrast, all the acts now listed in section 11352 were prohibited by the statute when it was first adopted in 1972. (Stats. 1972, ch. 1407, § 3, p. 3013.) The provisions were written together, and should be read together.

The second lesson of the legislative history is that section 11352 does not stand alone, contrary to the way in which the majority view it. It was enacted as one part of a sweeping revision of the laws governing legal and illegal narcotics in this state. (Stats. 1972, ch. 1407, p. 2986.) The revision repealed virtually all the laws on the subject (*id.*, § 2, p. 2987) and replaced them with a new legislative plan called the California Uniform Controlled Substances Act (*id.*, § 3, p. 2987). Chapter 2 of that act (*id.*, § 3, p. 2990) listed the "controlled substances" to which it applied, and chapter 6 (*id.*, § 3, p. 3011) listed the types of conduct that it prohibited. The first article of chapter 6 (*ibid.*) dealt with conduct involving the typical "hard" drugs such as opium, morphine, heroin, cocaine, and their derivatives. And the six substantive sections of that article, now codified in the Health and Safety Code, set forth six distinct aspects of such conduct that the Legislature chose to prohibit and separately punish. The legislative plan was as follows:

*Section 11350*: crime—for anyone to possess a controlled substance; penalty—two to ten years' imprisonment.[4]

*Section 11351*: crime—for anyone to possess a controlled substance for sale; penalty—five to fifteen years.

*Section 11352*: crime—for anyone to import or transport, sell or give away a controlled substance or to offer or attempt the same; penalty—five years to life.

---

[4] For each section I shall note only the penalty for first offenders. Higher penalties were imposed on recidivists.

*Section 11353*: crime—for an adult (1) to induce a minor to violate the Uniform Controlled Substances Act or (2) to employ a minor to peddle a controlled substance or (3) to sell or give a controlled substance to a minor; penalty—10 years to life.

*Section 11354*: crime—for a minor to do to a minor any of the acts prohibited in the previous section; penalty—up to five years.

*Section 11355*: crime—for anyone to sell or furnish a nonnarcotic material while falsely representing it to be a controlled substance; penalty—jail up to one year or prison up to ten years.[5]

"A statute must be construed 'in the context of the entire statutory system of which it is a part, in order to achieve harmony among the parts.' [Citation.]" (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1009 [239 Cal.Rptr. 656, 741 P.2d 154] [construing a statute adopted by Prop. 8].) When section 11352 is thus construed in the context of the Uniform Controlled Substances Act, it is apparent that the Legislature intended by this section to prohibit all forms of trafficking in illegal narcotics, just as other sections of the law prohibited all forms of possession, or possession for sale, or sales involving minors, etc. "[S]ection 11350 [possession of narcotics] and section 11352 are aimed at distinct and separate aspects of the 'war on drugs.'" (*People* v. *Cortez* (1985) 166 Cal.App.3d 994, 1001 [212 Cal.Rptr. 692].) Although section 11352 lists a number of prohibited acts, they all relate to a single legislative goal—the goal of stopping the flow of illegal narcotics in our society. By means of this list the Legislature seeks to reach the principal ways in which illegal narcotics enter and move through the community: i.e., it recognizes that narcotics can be *imported* into our state or can be *transported* within the state, and they can be *sold* by one person to another or can be *given* (or furnished or administered) by one person to another. What is true of the transportation component of section 11352 is thus true of the entire statute: it attempts "to prevent or deter the

---

[5]In the years since 1972 the Legislature has added a few special narcotics crimes and changed the penalties to conform to the determinate sentencing law. In all essential respects, however, the statutory plan remains intact today. The fact that the scheme was deliberate is also demonstrated by the very next article of the Uniform Controlled Substances Act, in which the Legislature adopted a closely similar format to deal with marijuana offenses. (Stats. 1972, ch. 1407, § 3, p. 3015 [art. 2].) In that article the Legislature made it a crime to possess marijuana (Health & Saf. Code, § 11357), to cultivate marijuana (*id.*, § 11358), to possess marijuana for sale (*id.*, § 11359), to import or transport, sell or give away marijuana, or to offer or attempt the same (*id.*, § 11360), and for an adult to induce a minor to use marijuana, or to employ a minor to peddle, or to sell or give marijuana to a minor (*id.*, § 11361). As noted above, the operative wording of section 11360 is identical to that of section 11352, the statute *now before us*.

movement of drugs from one location to another, thereby *inhibiting trafficking in narcotics* and their proliferation in our society." (166 Cal.App.3d at p. 1000, italics added.)

Speaking of the immediate predecessor of section 11352, the court in *People v. Holquin* (1964) 229 Cal.App.2d 398, 402 [40 Cal.Rptr. 364] stated: "Clearly, Health and Safety Code section 11501 was enacted *to prevent traffic in narcotics* and to prevent a narcotic from getting into the hands of those having no right to possess it. To that end the section makes it a criminal offense to effect an illegal change of possession of a narcotic, regardless of the means used to accomplish the transfer." (Italics added.) After quoting the operative wording of the statute—identical to the list of acts now prohibited in section 11352—the court reasoned (229 Cal.App.2d at p. 402): "The language of the statute makes no distinction among the various means for change of possession; *the crime is the same* whether the transfer of a narcotic is accomplished by selling, furnishing, administering, or giving it away." (Italics added.)[6]

In short, when viewed in the light of the legislative plan as a whole, section 11352 in effect prohibits different ways of engaging in the same targeted criminal conduct—trafficking in illegal narcotics. This conclusion is reinforced by considering the penalty provisions of section 11352. Although the penalties have been substantially reduced since the adoption of the statute in 1972, one significant factor has remained constant throughout: section 11352 has always imposed an identical punishment on any of the acts it prohibits; whichever way the defendant violates the statute—by importing or transporting, or by selling or giving away—the penalty remains the same: today that penalty is "imprisonment in the state prison for three, four, or five years." (§ 11352.) It is difficult to believe that the Legislature would have so consistently imposed a single penalty on the conduct prohibited by section 11352 if, as the majority conclude, that conduct actually comprises a number of wholly disparate crimes.[7]

---

[6] In *People v. Daniels* (1975) 14 Cal.3d 857, 861-862 [122 Cal.Rptr. 872, 537 P.2d 1232], we disapproved the particular holding of *People v. Holquin, supra,* 229 Cal.App.2d 398 (i.e., that furnishing a narcotic is a specific intent crime), because it was based on a misreading of two earlier decisions of this court, but we did not question the statutory analysis quoted hereinabove.

[7] I recognize that a special enhancement statute added in 1976 (Health & Saf. Code, § 11352.5, subds. (2) and (3)) allows the further penalty of a fine to be imposed on one who violates section 11352 "by selling or offering to sell" either 14.25 grams or more of heroin, or any amount of heroin if the defendant has a prior conviction of violating Health and Safety Code sections 11351 or 11352. But this enhancement statute deals only with the sale of heroin, and manifestly does not provide a separate penalty for "furnishing cocaine." More important, this narrow exception, inserted by a later amendment, does not destroy the overall uniformity of the penalty provisions of section 11352, which mirror the recurring pattern of the Uniform Controlled Substances Act—i.e., a single range of punishment for each category of

Finally, additional support for this conclusion may be found in cases construing section 11352 or its predecessors in related contexts. As noted earlier, both the complaint and the information in the case at bar charged in each of three counts that defendant violated section 11352 in that he did "transport, import into the State of California, sell, furnish, administer, and give away, and offer to transport, import into the State of California, sell, furnish, administer, and give away, and attempt to import into the State of California and transport" cocaine. An accusatory pleading that charges "more than one offense" in the same count is defective and will be set aside on demurrer. (Pen. Code, §§ 954, 1004, subd. 3.) But it has long been held (see, e.g., *People* v. *Frank* (1865) 28 Cal. 507, 513) that when a statute enumerates a series of acts of which any one can constitute a violation, several or even all the acts may properly be charged in one count because the statute nevertheless declares only "one offense." (E.g., *People* v. *Gosset* (1892) 93 Cal. 641, 643 [29 P. 246] [only one offense stated by pleading in terms of Pen. Code, § 330, which punishes every person "who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee," certain illegal card games for money].)

The same reasoning has been applied to a predecessor statute of section 11352. In *People* v. *Kinsley* (1931) 118 Cal.App. 593, 595 [5 P.2d 938], the information charged, in the terms of the narcotics control statute then in force, that the defendant did "sell, furnish, and give away, and offer to sell, furnish and give away," a quantity of morphine without a prescription. Affirming the conviction, the Court of Appeal reasoned in part as follows: "The contention is made that the information which charges appellant with selling, furnishing and giving away, and offering to sell, furnish and give away morphine is fatally defective under the provisions of section 954 of the Penal Code, as stating separate offenses in the same count. The objection is not well taken, since it is apparent that the information charges appellant with the doing of various acts, any one of which or *all of which constitute a single violation of the statute* mentioned in the information [citations]." (*Id.* at p. 597, italics added.)

Nor is it necessary for the prosecution to elect, or for the court to instruct on, or even for the jury to find, which of the several possible acts the defendant committed in violating the statute. In *People* v. *Pierre* (1959) 176 Cal.App.2d 198, 199 [1 Cal.Rptr. 223], the indictment charged in the terms of a predecessor statute of section 11352 that the defendant did "sell,

conduct that it declares criminal. (E.g., whichever of several possible ways an adult violates Health & Saf. Code, § 11353 with a minor, the penalty remains the same—three, five, or seven years in prison.)

furnish and give away a narcotic, to wit, heroin." Affirming the conviction, the Court of Appeal reasoned in part as follows: "It is asserted that the court should have instructed the jury 'on which of the three premises: *Sell, Furnish,* or *Give away,* the prosecution relied upon.' The judge was not required to do so. He did, however, instruct at the request of the People: 'It is unlawful for any person to sell, furnish, administer or give away a narcotic.' [Citation.] The indictment is couched in the language of the statute, is in the conjunctive, and the verdict is that defendant is guilty of violation of section 11500 Health & Safety Code 'as charged in the indictment.' In no respect is this improper procedure [citations]. The foregoing authorities also dispose of the contention that the verdict is incomplete because it does not 'specifically find upon which of the three premises, *(Sell, Furnish,* or *Give away),* that the Statute was violated.'" (176 Cal.App.2d at p. 203, italics in original.)

Indeed, section 11352 is so unitary that a conviction may be affirmed *even if the jury is mistaken as to which of the enumerated acts the defendant committed.* In *People* v. *Cornejo* (1979) 92 Cal.App.3d 637 [155 Cal.Rptr. 238], the defendant was a middleman in a sale of heroin to an undercover police officer. As a step in the negotiations leading to that sale, the defendant gave the officer a small amount of heroin to sample. He was convicted of violating section 11352 by *selling* the latter sample to the officer, the jury making a special finding that in so doing he *sold* less than a half-ounce of heroin (see Health & Saf. Code, § 11352.5, subd. (2)). On appeal he attacked the judgment as unsupported by the evidence because there was no proof that he ever intended to sell the sample that he gave to the officer. The Court of Appeal impliedly agreed there was no such proof, but nevertheless affirmed the judgment: it reasoned that because the evidence showed that the defendant at least "furnished" or "gave" the heroin sample to the officer, the jury properly convicted him of violating section 11352 in any event. (92 Cal.App.3d at p. 660.) In so holding, the Court of Appeal in effect substituted one means of violating section 11352 (furnishing) for another (selling)—a disposition that would have been impossible if, as the majority believe, the acts prohibited by the statute were distinct crimes rather than merely different ways of committing the single offense of trafficking in illegal narcotics.

When section 11352 is thus seen in the light of its history and its place in the Legislature's elaborate plan for controlling illegal narcotics, it is clear that the reasoning of our opinion in *People* v. *Henderson, supra,* 19 Cal.3d 86, applies to the issue before us. Here as in *Henderson* (*id.* at p. 95), "The Legislature has not drawn any relevant distinctions" between trafficking by furnishing cocaine and trafficking by importing, transporting, or selling

cocaine—or indeed any other controlled substance. Again as in *Henderson* (*ibid.*), "The Legislature has not evinced a particular concern" for furnishing cocaine—as opposed to other forms of trafficking in that drug—"by separate statutory treatment, proscription, or punishment." To hold otherwise, as do the majority, is to rewrite the statute in the face of plain legislative intent to the contrary. It follows that under the rule of *Henderson* and the related cases discussed above, the dispositive issue here is whether a violation of section 11352 as a whole is a felony inherently dangerous to human life.

That issue is not difficult to decide. As both the trial court and the Court of Appeal correctly observed, section 11352 can be violated in various ways that do not create a substantial risk of death. For example, it is violated by one who simply carries a small amount of cocaine home in his pocket for his personal use, or by a motorist who simply offers a ride in his car to a friend who he knows is carrying a similar amount of cocaine for his own use; no other act or intent need be proved for a conviction. (See, e.g., *People* v. *Rogers* (1971) 5 Cal.3d 129, 133-137 [95 Cal.Rptr. 601, 486 P.2d 129] [violation of Health & Saf. Code, § 11531]; *People* v. *Cortez, supra,* 166 Cal.App.3d 994, 997-998 [violation of § 11352].) Accordingly, as the trial court ruled, a violation of section 11352 is not "inherently so dangerous that by its very nature, it cannot be committed without creating a substantial risk that someone will be killed" (*People* v. *Burroughs, supra,* 35 Cal.3d 824, 833). Because section 11352 is not a felony inherently dangerous to human life, it cannot serve as a predicate for the second degree felony-murder rule; and because the prosecutor indicated to the court that felony murder was his sole theory on the homicide count, the court correctly dismissed that count in the interest of justice.

On a different issue, I agree that for purposes of the second degree felony-murder rule a felony inherently dangerous to human life should be defined as a felony carrying a high probability that it will result in death. In future cases that standard will contribute to greater fairness and proportion in the application of the second degree felony-murder rule. But even if the court had used that definition in the case at bar, its ruling would have been correct. The court found that a violation of section 11352 is not an inherently dangerous felony under the "substantial risk" test of *Burroughs* (35 Cal.3d at p. 833). Because that test is less stringent than the "high probability" standard we now adopt, it is obvious that the court would have made the same ruling under our new standard.

I would affirm the judgment of the Court of Appeal.

Broussard, J., concurred.

**PANELLI, J.,** Concurring and Dissenting.— I join fully in Justice Mosk's opinion, including the approval of the "high probability of death" standard. I am writing separately to emphasize the need for legislative attention to the second degree felony-murder rule.

This case has generated both substantial disagreement and some uneasiness. The disagreement is evident in how the court has split on the issues before us. I am uneasy because we have traveled very close to the edge of our role as judges and have come perilously close to becoming legislators. We have, as the majority notes, however, tried to resolve this case simply by "applying the established definition of inherent dangerousness." (Maj. opn., *ante,* p. 627.) But we must bear in mind that both that definition and the crime, itself, are our own creations.

Although courts are often called upon to make policy choices—and this court has not shirked its responsibility to do so—our mandate to make policy in this context is not particularly strong. There are, or at least should be, no nonstatutory crimes in this state. (*In re Brown* (1973) 9 Cal.3d 612, 624 [108 Cal.Rptr. 465, 510 P.2d 1017]; see Pen. Code, § 6.) The second degree felony-murder rule, however, either creates a nonstatutory crime or increases the punishment for statutory crimes beyond that established by the Legislature. We derive such authority neither from the Constitution (see Cal. Const., art. III, § 3) nor from the Penal Code (See Pen. Code, §§ 6, 12, 13, 15).

My uneasiness with the second degree felony-murder rule is mirrored in the majority's adoption of the new "high probability of death" standard, which certainly will restrict the rule's future application. (See dis. opn. of Lucas, C. J., *ante,* p. 628.) It may also be reflected in how often the majority mentions that the Legislature has failed to act. (Maj. opn., *ante,* pp. 621, 626, fn. 8, 627.) Today the majority expressly relies on that failure as a justification for continuing to "determine the scope" of this anomalous common law crime. (Maj. opn., *ante,* p. 627.) But in view of the Legislature's long-standing declaration that "[n]o act or omission . . . is criminal or punishable, except as prescribed or authorized by [the Penal Code]" (Pen. Code, § 6), I question whether subsequent legislative inaction is a sufficient justification.

In short, I am not quite convinced that the second degree felony-murder rule stands on solid constitutional ground. Since the rule permits a court to

increase the punishment for certain dangerous crimes, the temptation to invoke it is great when we are facing the type of social crisis that illegal drugs have brought upon us. While I am aware of the crisis, nevertheless, I respectfully suggest that it is the Legislature that has the resources and constitutional authority to determine and define what conduct is criminal and to set the punishment for such crimes.

I would affirm the decision of the Court of Appeal.

Appellant's petition for a rehearing was denied November 8, 1989.